IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED FOOD & COMMERCIAL
WORKERS INTERNATIONAL
UNION-INDUSTRY PENSION FUND, *et al.*,

   **Plaintiffs,**

v.               Civil Action No. 3:19cv247

EC MANAGEMENT SERVICES
OF GEORGIA, INC., *et al.*,

   **Defendants.**

## <u>MEMORANDUM OPINION</u>

  This matter comes before the Court on Defendants EC Management Services of Georgia,

Inc. ("EC Georgia"), Earl Mason, and George Otey's (collectively, the "Named Defendants")

Renewed Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Second

Motion to Dismiss").[1]  (ECF No. 55.)  Plaintiffs United Food & Commercial Workers

International Union-Industry Pension Fund and Walter B. Blake and Anthony M. Perrone, in

their capacity as trustees (collectively, the "Fund") responded, (ECF No. 57), and the Named

Defendants replied, (ECF No. 59).[2]

---

[1] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

[2] The Fund identifies a fourth defendant, John Doe, who it alleges "is an unidentified company that formed a joint venture with EC Management and to which EC Management reported a $1,522,227.00 payment to in 2014."  (Compl. ¶ 12, ECF No. 1.)  As stated above, the Court will refer to the three defendants who filed the present Second Motion to Dismiss as the Named Defendants and will refer to "Defendants" when including John Doe.

 The Named Defendants' Renewed Motion to Dismiss does not encompass John Doe. (*See* Mot. Dismiss 1 n.1, ECF No. 55.)  As explained in this Memorandum Opinion, the Court will dismiss all claims brought against John Doe without prejudice.

The matter is ripe for disposition.  The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process.  The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[3]  For the reasons that follow, the Court will grant in part and deny in part the Second Motion to Dismiss.

### I.  Factual and Procedural Background

The Fund brings this five-count action alleging that the Defendants impermissibly sought to avoid payment of their withdrawal liability from an employee benefit plan in violation of ERISA, 29 U.S.C. § 1001, and Virginia law.

### A.    Factual Background[4]

The Fund is an employee benefit plan within the meaning of ERISA, and "is established and maintained pursuant to section 302(c)(5) of the Labor Management Relations Act of 1947, 29 U.S.C. § 186(c)(5)."  (Compl. ¶ 3.)

---

[3] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331(a).  In Counts IV and V, the Complaint alleges that Defendants violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461.  Pursuant to ERISA, this Court has jurisdiction over such claims.  29 U.S.C. § 1132 ("[T]he district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, fiduciary, or any person referred to in section 1021(f)(1) of this title.").  Congress enacted ERISA to "protect . . . the interests of participants in employee benefit plans and their beneficiaries" by setting out substantive regulatory requirements for employee benefit plans.  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004).  Additionally, the statute provides for "appropriate remedies, sanctions, and ready access to the Federal courts."  *Id.*  The Court exercises supplemental jurisdiction over the Fund's state law claims.

[4] For the purpose of the Rule 12(b)(6) Motions to Dismiss, the Court will accept the well-pleaded factual allegations in the Fund's Complaint as true, and draw all reasonable inferences in favor of the Fund.  *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) ("[A] court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'") (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

EC Management "was a Virginia corporation doing business in the Fort Lee and Richmond, Virginia areas" and was formed to provide janitorial services at Fort Lee.  (*Id*. ¶ 16.) Upon information and belief, the Fund alleges that Earl Mason and George Otey were "owner[s] of EC Management."  (*Id*. ¶¶ 10–11.)  EC Management participated in the Fund "pursuant to a collective bargaining agreement" that required it to "contribute to the Fund on behalf of eligible employees performing bargaining unit work at Fort Lee, Virginia."  (*Id*. ¶ 17.)

On September 15, 2013, EC Management "experienced a permanent cessation of covered operations within the meaning of ERISA § 4203(a), 29 U.S.C. § 1383(a)."  (*Id*. ¶ 18.) Accordingly, the Fund "determined that EC Management had experienced a complete withdrawal within the meaning of ERISA" and assessed withdrawal liability in the amount of $13,072,000.00.  (*Id*. ¶¶ 19–20.)

Roughly two months later, on November 20, 2013, the Fund notified EC Management of its withdrawal liability, and set a schedule for liability payments.  (*Id.* ¶ 21.)  EC Management, however, made only one payment of $13,072.00 on its withdrawal liability.  (*Id*. ¶ 22.)  In 2014, the Fund brought an action in the federal district court in the Northern District of Illinois to collect the withdrawal liability from the collective bargaining agreement.[5]  (*Id*. ¶¶ 2, 24.)  On November 7, 2014, the Northern District of Illinois court awarded United Food $12,738,917.25 (the "Judgment") against EC Management.  (*Id*. ¶¶ 2, 24.)

In 2015, after having been awarded the Judgment, the Fund sought to collect the Judgment from EC Management in the Circuit Court for Henrico County, Virginia, but "has been unable to collect any payments."  (*Id*. ¶ 26.)  In May 2016, EC Management "was dissolved with no substantial assets."  (*Id*.)

---

[5] *See United Food & Com. Workers Int'l Union-Indus. Pension et al. v. E-C Mgmt.*, *Servs. of Ga.*, 1:14cv6276 (N.D. Ill. 2014).

Relevant to this action, the Fund alleges that Defendants sought to improperly avoid their collective withdrawal liability to the Fund in three ways:  (1) Mason and Otey as co-owners of EC Management authorized payments to themselves on three occasions after EC Management became liable for withdrawal liability; (2) EC Management and EC Georgia, through Otey's ownership, acted together as a single employer and/or alter ego to avoid withdrawal liability; and, (3) John Doe—an unidentified company—operated in conjunction with EC Management as a single employer to avoid withdrawal liability.  (Mem. Supp. Second Mot. Dismiss, ECF No. 56.)

### 1.    The Fund Alleges Mason and Otey Fraudulently Received EC Management Property After the Fund Assessed Withdrawal Liability

First, the Fund alleges that Mason and Otey authorized EC Management, fraudulently, to transfer EC Management property to them after EC Management became liable for withdrawal liability.  The Fund states that Mason and Otey "as 50-50 co-owners of EC Management, were responsible for authorizing any payments made by EC Management."  (Compl. ¶ 28.)  Mason and Otey received EC Management property on three occasions, each occurring after EC Management became liable to the Fund for withdrawal liability:

> Upon information and belief, Mason and Otey received $10,363.13 from insurance policies owned by EC Management after the withdrawal liability had been assessed.

> Upon information and belief, Mason and Otey also received $50,000 from EC Management's corporate bank account after the withdrawal liability had been assessed.

> Upon information and belief, Mason and Otey also retained company vehicles owned by EC Management for personal use after the withdrawal liability had been assessed.

(*Id*. ¶¶ 29–31.)  Because of these transfers, EC Management "was left insolvent and lacked sufficient assets to pay . . . the withdrawal liability."  (*Id*. ¶ 32.)  The Fund states that these

constitute "fraudulent transfers, as they were made to avoid or evade EC Management's . . . assessed withdrawal liability."  (*Id*. ¶ 33.)

### 2.     The Fund Alleges EC Management and EC Georgia Acted Together as a Single Employer and/or Alter Ego to Avoid Withdrawal Liability

Second, the Fund alleges that "EC Georgia operated in conjunction with EC Management as a single employer and/or its alter ego" to transfer payments and avoid withdrawal liability. (Compl. 6.)  In support of that claim, the Fund notes that "EC Georgia is owned by [George] Otey's brother, Antonio Otey."  (*Id*. ¶ 34.)  Upon information and belief, "Antonio worked for EC Management from 1986 to 2000 and at various intermittent times thereafter" and "EC Management's website . . . still cites Antonio Otey as EC Management's Chief Financial Officer."  (*Id*.)

EC Management and EC Georgia shared "interrelated operations, common management and centralized control of labor relations."  (*Id*. ¶ 39.)  Both companies "provided janitorial services" and "upon information and belief . . . serviced the same customers;" "operated out of the same office building;" and, "shared the same telephone number."  (*Id*. ¶¶ 35, 37.) Furthermore, EC Georgia performed "a number of services for EC Management, including accounting services" and "assumed EC Management's lease" after the latter's dissolution.  (*Id*. ¶¶ 36–37.)

The Fund asserts that "EC Management transferred at least $160,000 to EC Georgia purportedly as a 'loan,' without documenting the loan or seeking re-payment."  (*Id*. ¶ 38.)

### 3.     The Fund Alleges EC Management and an Unidentified Company Acted Together as a Single Employer to Avoid Liability

Third, the Fund alleges that John Doe operated in conjunction with EC Management as a single employer.  (Compl. 7.)  Upon information and belief, during or prior to 2014, EC

Management and John Doe formed a joint venture which "operated jointly, had common management, used the same work force . . . had common ownership" and "performed the same janitorial services for the same customers." (*Id*. ¶¶ 40–42.) The Fund alleges that "EC Management paid $1,522,227 during the 2014 calendar year to John Doe in furtherance of the joint venture" making John Doe liable for EC Management's withdrawal liability as a single employer with or alter ego of EC Management. (*Id*. ¶¶ 12, 43.)

### B.  **Procedural History**

The Fund originally filed its Complaint in the United States District Court for the Northern District of Illinois, Eastern Division. (ECF No. 1.) The Complaint, which now pends before this Court, brings five counts against Defendants:

| | |
|---|---|
| **Count I:** | Mason and Otey acted as "alter-egos of EC Management, exercising complete control over the entity at the time of the [fraudulent] payment and transfers" and therefore the Court should "pierce the corporate veil and hold Mason and Otey personally liable for EC Management's withdrawal liability" (the "Piercing the Corporate Veil Claim"); |
| **Count II:** | Mason and Otey made fraudulent transfers from EC Management to themselves "with the intent to hinder, delay, or defraud EC Management's creditors" in violation of Virginia's Fraudulent Transfer Act ("VFTA"), Va. Code § 55-80 (the "Mason and Otey VFTA Claim"); |
| **Count III:** | John Doe received the $1,522,227 loan from EC Management with the "intent to hinder, delay, or defraud EC Management's creditors" in violation of the VFTA (the "John Doe VFTA Claim");[6] |
| **Count IV:** | EC Georgia and John Doe operated "as a single employer and/or alter ego with EC Management" and "is jointly and severally liable with EC Management for all sums owed to the Fund by EC Management, including all withdrawal liability" (the "EC Georgia and John Doe Single Employer Claim"); |

---

[6] The Named Defendants' Renewed Motion to Dismiss does not encompass John Doe because Counsel for the Named Defendants does not represent that party. (*See* Mot. Dismiss 1 n.1, ECF No. 55; Resp. 6, n.3. ECF No. 57.) As discussed in this Memorandum Opinion, the Court will nonetheless dismiss all claims brought against John Doe without prejudice.

**Count V:**    Defendants sought to "evade or avoid" their withdrawal liability through the payments and transfers from:  (1) EC Management to Mason and Otey; (2) EC Management to EC Georgia; and (3) EC Management to John Doe in violation of ERISA § 4212(c), 29 U.S.C. § 1392(c) (the "Evade or Avoid Claim").

(Compl. ¶¶ 46–74.)  As relief, the Fund asks the Court to "enter judgment against Mason and Otey" and "impose a constructive trust in favor of the Fund on all assets fraudulently distributed to Mason and Otey."  (*Id.* 12.)  The Fund further requests that the Court "void and disregard" all payments and transfers made to Mason and Otey, EC Georgia, and John Doe, and enter judgment against EC Georgia and John Doe awarding the Fund all withdrawal liability, interest, and liquidated damages in accordance with ERISA provisions.  (*Id.* 12–13.)

In response, the Named Defendants filed a Motion to Dismiss, (ECF No. 10), or in the alternative, a Motion to Transfer Venue to the Eastern District of Virginia, Richmond Division, (ECF No. 15).  United States District Judge Charles P. Kocoras granted the Motion to Transfer Venue and "decline[d] to rule on the pending motion to dismiss so that the issue may be decided by a court in the appropriate venue."  (N.D. Ill. Court March 26, 2020 Order 9, ECF No. 33.)  On April 9, 2019, the Northern District of Illinois transferred the case to this Court.  (ECF Nos. 34–35.)  The Named Defendants re-filed a version of their Motion to Dismiss (the "First Motion to Dismiss").  (ECF No. 36.)  The Fund responded, (ECF No. 45), and the Named Defendants replied, (ECF No. 49).

On February 28, 2020, this Court denied the Named Defendants' First Motion to Dismiss as moot, ordering briefing on three issues of law raised in the First Motion to Dismiss.  (*See* Feb. 28 Mem. Op. & Order, ECF Nos. 52, 53.)

First, the Court asked the Parties to brief whether it should apply federal common law or state substantive law to the Fund's piercing the corporate veil claim seeking to collect

withdrawal liability under ERISA in Count I.  (Feb. 28, 2020 Mem. Op. 2–3.)  Although the

Parties assumed that Virginia law applied, the Court noted that the United States Court of

Appeals for the Fourth Circuit and other district courts "applied federal common law in actions

to pierce the corporate veil for ERISA and other liabilities arising under federal law."  (*Id*. 2.)

The Court ordered that any "subsequent briefing include arguments addressing whether the

federal common-law standard for piercing the corporate veil . . . should apply to the claim at

bar."  (*Id*.)

Second, the Court observed that the ERISA's civil remedies prohibiting fraudulent

transfers of assets to avoid withdrawal liability might preclude the Fund's Virginia Fraudulent

Transfer Act claims in Counts II and III.  The Court therefore ordered that any subsequent

briefing include discussion of "whether the Fund's Virginia claims for fraudulent transfer are

preempted by ERISA . . . and whether allowing such claims would undermine uniformity in

federal law and contravene Congressional intent."  (*Id*. 4–5.)

Third, the Court ordered the Fund "to show cause as to why John Doe should not be

dismissed as a party."  (*Id*. 5.)

The Named Defendants timely refiled the Second Motion to Dismiss.  (ECF No. 55.)

The Fund responded, (ECF No. 57), and the Named Defendants replied, (ECF No. 59).

In their Second Motion to Dismiss, the Named Defendants raise five arguments to

support their position that the Court should dismiss the action:  (1) that Virginia's veil-piercing

standard apply to the Fund's claim in Count I; (2) that, applying this standard, the Complaint

fails to state a veil-piercing or alter ego claim against Mason and Otey; (3) that the Complaint

fails to allege facts to support a claim that EC Georgia was formed with fraudulent intent or as an

attempt to avoid EC Management's obligations as necessary for Count IV; (4) that ERISA

preempts the Fund's VFTA fraudulent transfer claims; and, (5) that the Complaint fails to state claims under both fraudulent transfer and evade or avoid liability in Count V.  (Mem. Supp. Mot. Dismiss 7–18, ECF No. 56.)

The Fund contends that it brings proper claims against the Named Defendants.  (*See generally* Resp.)  The Fund agrees Virginia law applies to the veil-piercing allegations in Count I (and that the Fund satisfies the Virginia requirements for stating such a claim).  (*Id.* 7–10.)  The Fund posits that the Motion to Dismiss does not encompass claims as to John Doe.  (*Id.* 6 n.3.)

Regarding the John Doe defendant, the Fund asserted that it would "likely [be] able to identify the John Doe defendant after further discovery."  (ECF No. 58.)  The Named Defendants replied stating that the Fund should "name Virginia Department for the Visually Impaired as a Defendant ('VADVI') rather than proceed against an unidentified, John Doe" and that the Fund "discovered the identity of the alleged John Doe prior to filing" its Complaint. (ECF No. 60.) The Fund did not reply to the Named Defendants' statement concerning John Doe.

## II.   Standard of Review:  Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief.").  Mere labels and conclusions declaring that the plaintiff is entitled to relief

9

are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotations omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193. The Court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 676–79; *see also Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)). This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

"Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013) (quoting *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011)).

### III.  Analysis

The Court will grant in part and deny in part the Second Motion to Dismiss.  First, the Court will deny the Second Motion to Dismiss Count I against Mason and Otey, finding the Fund pleads sufficient facts to pierce the corporate veil of EC Management under both Virginia law and federal common law.

Second, the Court determines that ERISA preempts the Fund's VFTA claims brought in Counts II and III, and will dismiss those claims in their entirety.  Third, as to the Fund's Evade or Avoid claims arising under ERISA brought in Count V, the Court concludes that the Fund states a claim against Mason and Otey, but not EC Georgia or John Doe.  The Court also finds that the Fund improperly names John Doe as a defendant in this action and will therefore dismiss that claim without prejudice.[7]

Finally, the Court will dismiss Count IV against both EC Georgia and John Doe.  The Court determines that the Fund does not state a plausible claim for single employer or alter ego liability against EC Georgia.  The Court also finds that, even considering the allegations again John Doe, the Fund does not state a claim against Jon Doe for single employer or alter ego liability.

---

[7] Although this Court dismisses the claims brought against John Doe, pursuant to Rule 4(m), and consistent with this Court's prior treatment of Doe defendants, the dismissal must be without prejudice.  *See* Fed. R. Civ. P. 4(m) ("If a defendant is not served within 90 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant[.]").  That rule flows from the principle that a court generally lacks personal jurisdiction over unserved parties. *See, e.g.*, *Attkisson v. Holder*, 925 F.3d 606, 628 (4th Cir. 2019), as amended (June 10, 2019) (quoting *Koehler v. Dodwell*, 152 F.3d 304, 306 (4th Cir. 1998) ("Absent waiver or consent, a failure to obtain proper service on the defendant deprives the court of personal jurisdiction over the defendant.")).

**A.      Count I:  The Court Will Deny the Second Motion to Dismiss the Piercing the Corporate Veil Claim**

The Court begins with the Fund's allegations that Mason and Otey acted as the alter egos of EC Management and abused its corporate form by initiating three fraudulent transfers of company assets to their personal accounts and use.  (*See* Compl. ¶¶ 47–51.)  Although the Court will apply the more rigorous standard of Virginia substantive law for the purposes of resolving the present Second Motion to Dismiss, Circuit Courts have reach opposing conclusions on this issue.[8]

The Fund states a claim against Mason and Otey to pierce the EC Management corporate veil.  First, the Court finds that the Fund plausibly alleges that a unity of interest and ownership existed between EC Management and Mason and Otey sufficient to satisfy the first prong of

---

[8] Based on the Parties' agreement and because the Court finds that the Fund states a claim under the more rigorous Virginia veil-piercing standard, the Court declines to address whether ERISA preempts Virginia law as to the Fund's claims that ground on withdrawal liability.  The United States Court of Appeals for the Fourth Circuit has indicated that courts should apply federal common law, and not state law, for ERISA veil-piercing claims.  *See Thomas v. Peacock,* 39 F.3d 493, 499 (4th Cir. 1994) ("Because a rule of veil-piercing determines who is liable for breaches of ERISA fiduciary duties, we believe that ERISA preempts any state law of veil-piercing.") *rev'd on other grounds*, 516 U.S. 349 (1996).

In contrast, the United States Courts of Appeals for the Seventh Circuit and Third Circuit have indicated that state law should apply to such veil-piercing claims.  *See Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1193 (7th Cir. 1989); *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 171 (3d Cir. 2002) (applying New Jersey law to veil-piercing claim under ERISA without discussion).  Similarly, the Pension Benefit Guaranty Corporation ("PBGC"), the entity charged with interpreting Title IV and administering withdrawal liability issued an Opinion Letter "expressly recogniz[ing] that state law, not federal common law controls under Title IV."  PBGC Opinion Letter 82–038 (Dec. 14, 1982).  As to the PBGC's construction of the statute, the United States Supreme Court has recognized that it "surely may not reject . . . [this] construction . . . without careful examination of Title IV and its underlying legislative history."  *Nachman Corp. v. Pension Ben. Guar. Corp*., 446 U.S. 359, 373–74 (1980).

For the purposes of this Motion, the difference between the more lenient federal standard for piercing the corporate veil and the Virginia standard is of no moment because the Fund states a claim against Mason and Otey in Count I sufficient to satisfy the more rigorous Virginia veil-piercing standard.

Virginia's veil-piercing test.  Second, the Fund states a claim that Mason and Otey used the corporate form to disguise a wrong, or obscure a fraud, so as to satisfy the second prong of Virginia's veil-piercing test.

### 1.    Legal Standard:  Piercing the Corporate Veil in Virginia

A corporation exists "as a legal entity separate and distinct from its shareholders." *Perpetual Real Estate Servs., Inc. v. Michaelson Props., Inc.*, 974 F.2d 545, 548 (4th Cir. 1992) (applying Virginia law).  "Virginia courts have assiduously defended this 'vital economic policy,' lifting the veil of immunity only in 'extraordinary' cases."  *Id*. (citations omitted).

The Supreme Court of Virginia has established a two-part test for piercing the corporate veil.  First, the plaintiff must show "unity of interest and ownership is such that the separate personalities of the corporation and the individual no longer exist." *O'Hazza v. Exec. Credit Corp.*, 431 S.E.2d 318, 320–21 (Va. 1993) (citations omitted).  The corporate entity must function as "the alter ego, alias, stooge, or dummy of the individuals sought to be charged personally."  *Cheatle v. Rudd's Swimming Pool Supply Co.*, 360 S.E.2d 828, 831 (Va. 1987); *see also Michaelson Props.*, 974 F.2d at 548.  The Virginia Supreme Court "has identified a number of factors used in determining the first part of the piercing the corporate veil analysis [including]: (1) comingling of personal and corporate funds; (2) siphoning business assets into personal pockets; (3) undercapitalization of the business; and (4) whether business formalities were observed."  *McCarthy v. Giron*, No. 1:13cv01559, 2014 WL 2696660, at *15 (E.D. Va. June 6, 2014).

Second, the plaintiff bears the burden of demonstrating that the corporate form "was a device or sham used to disguise wrongs, obscure fraud, or conceal crime."  *Cheatle*, 360 S.E.2d

at 831.  "Virginia law requires proof of some legal wrong before it undermines this basic assumption of corporate existence."  *Michaelson Props.*, 974 F.2d at 549.

Virginia courts recognize that even with this two-step approach there is "no single rule or criterion that can be applied to determine whether piercing the corporate veil is justified." *O'Hazza*, 431 S.E.2d at 320.  Each case necessitates an independent "examination of the particular factual circumstances surrounding the corporation and the acts in question."  *Id.*

> ### 2. The Fund States a Unity of Interest and Ownership Between EC Management and Mason and Otey Sufficient to Satisfy the First Part of Virginia's Veil-Piercing Test

The Fund satisfies the first part of the two-part test necessary to pierce the corporate veil under Virginia law by stating that EC Management functioned as "the alter ego, alias, stooge, or dummy" of Mason and Otey such that their separate personalities ceased to exist.  *Cheatle*, 360 S.E.2d at 831.[9]  In support of its claim that Mason and Otey abused the corporate form, the Fund alleges that Mason and Otey received EC Management property on three occasions:

29.   Upon information and belief, Mason and Otey received $10,363.13 from insurance policies owned by EC Management after the withdrawal liability had been assessed.

30.   Upon information and belief, Mason and Otey also received $50,000 from EC Management's corporate bank account after the withdrawal liability had been assessed.

---

[9] The Named Defendants assert that the piercing the corporate veil claim "is subject to [Federal] Rule [of Civil Procedure] 9(b)'s heightened pleading standard" because it "is based on allegations of fraud."  (Mem. Supp. Second Mot. Dismiss 8.)  When pursuing a fraud claim, a plaintiff "must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Although the Named Defendants do not cite any Eastern District of Virginia cases necessarily requiring the Court to apply Rule 9(b)'s heightened particularity requirement, the Fund nevertheless meets the particularity requirement of pleading by showing the "who, what, when, where, and how of the alleged fraud."  *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008).

31.     Upon information and belief, Mason and Otey also retained company vehicles owned by EC Management for personal use after the withdrawal liability had been assessed.

(Compl. 6.)

These three events, taken as true, demonstrate that Mason and Otey "comingl[ed] . . . personal and corporate funds" and "siphon[ed] business assets into personal pockets," *McCarthy*, 2014 WL 2696660, at *15.  Furthermore, the Fund alleges that "Mason and Otey, as 50-50 co-owners of EC Management, were responsible for authorizing any payments made by EC Management" and that they exercised "complete control over the entity at the time of the payments and transfers."   (Compl. ¶¶ 28, 47.)  These transfers, along with Mason and Otey's exclusive control over "any payments" made by EC Management at the time, show that there existed a "unity of interest and ownership" of EC Management such that "the separate personalities of the corporation and the individual no longer exist[ed]." *O'Hazza,* 431 S.E.2d at 320–21.

Furthermore, the timing of these transfers, after the $12,738,917.25 withdrawal liability had been assessed, raises the reasonable inference that Mason and Otey viewed the corporate accounts as coterminous with their own personal accounts and sought to shield those assets from creditors.  At least one court in the Eastern District of Virginia has found that comingling corporate and personal assets to render them "judgment proof" behind the corporate veil may show business practices "contrary to corporate formalities." *Job v. Simply Wireless, Inc.*, 160 F. Supp. 3d 891, 901 (E.D. Va. 2015).

While no one factor used in determining the first part of the piercing the corporate veil analysis controls, the Fund alleges facts satisfying three of the four factors underlying the first step of the test:  (1) comingling of personal and corporate funds; (2) siphoning business assets

15

into personal pockets; and, (3) whether business formalities were observed.  *See McCarthy*, 2014 WL 2696660, at *15.  As other courts have observed, "the ultimate decision of whether to pierce the corporate veil will largely turn on the resolution of questions of fact . . . and the court will not require [plaintiff] to allege [too much detail] about [defendant's] corporate structure . . . at [an] early, pre-discovery juncture."  *York Amateur Softball Ass'n v. Va. Legends Elite Softball Org., LLC*, No. 2:12cv475, 2012 WL 5361012, at *2 (E.D. Va. Oct. 31, 2012) (citations omitted).  For purposes of this Motion to Dismiss, the Fund plausibly alleges that a sufficient "unity of interest and ownership" existed between EC Management, Mason, and Otey sufficient to satisfy the first prong of Virginia's veil-piercing test.  *Id.*

### 3. The Fund States a Claim That Mason and Otey Used the Corporate Form to Disguise a Wrong or Obscure a Fraud Satisfying the Second Part of Virginia's Veil-Piercing Test

Next, the Fund plausibly alleges facts to meet the second part of the two-part test for piercing the corporate veil under Virginia law:  that the corporate form "was a device or sham used to disguise wrongs, obscure fraud, or conceal crime."  *Cheatle*, 360 S.E.2d at 831.

The Fund alleges that "after the withdrawal liability had been assessed," Mason and Otey made three transfers of corporate assets to their personal accounts and use.  (Compl. ¶¶ 29–31.) These transfers "were made to avoid or evade EC Management's creditors and liabilities, including the assessed withdrawal liability."  (*Id.* ¶ 33.)  Given the timing of these transfers, the Fund creates the reasonable inference that Mason and Otey used EC Management's corporate identity to avoid its contractual liabilities to the Fund, thereby disguising a legal wrong.  *Cheatle*, 360 S.E.2d at 831; *see also Job*, 160 F. Supp. 3d at 901 (finding comingling of assets to avoid creditors to be an "exploitation of the corporate form" warranting piercing the corporate veil).  These allegations support a claim that EC Management's corporate form "was a device or sham

16

used to disguise wrongs, obscure fraud, or conceal crime" sufficient to satisfy the second prong of Virginia's veil-piercing test. *Cheatle*, 360 S.E.2d at 831.

Because reading the Complaint favorably the Fund (1) shows a unity of interest and ownership between EC Management and Mason and Otey; and, (2) demonstrates that Mason and Otey used that unity of interest to perpetrate a legal wrong, the Fund states a claim for piercing the corporate veil under Virginia law. *See O'Hazza*, 431 S.E.2d at 320.  The Court will therefore deny the Second Motion to Dismiss Count I.

> ### B.     Counts II and III:  Because ERISA Preempts the VFTA Claims, the Court Will Grant the Motion to Dismiss Counts II and III

The Court turns to the Fund's claims brought pursuant to VFTA in Counts II and III, alleging that Defendants sought to evade their withdrawal liability by fraudulently transferring their assets.  Because ERISA preempts the Fund's state law claims for fraudulent transfer under the VFTA, the Court will dismiss Counts II and III.

To resolve the claims brought pursuant to VFTA in Counts II and III, the Court must first determine whether ERISA preempts such state law claims.

> ### 1.     Legal Standard:  ERISA Preemption

Congress enacted ERISA to protect the interests of participants in employee benefit plans by providing a "uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004); *see Marks v. Watters*, 322 F.3d 316, 322 (4th Cir. 2003).  To that end, ERISA "includes expansive pre-emption provisions . . . which are intended to ensure that employee benefit plan regulation would be 'exclusively a federal concern.'" *Davila*, 542 U.S. at 208 (citations omitted).

ERISA contemplates two types of preemption:  Section 514 *conflict* preemption, codified at 29 U.S.C. § 1144(a); and, Section 502 *complete* preemption, codified at 29 U.S.C. § 1132.

17

Relevant here, "[o]rdinary conflict preemption under ERISA § 514 is set forth in 29 U.S.C. 1144(a):[10] state laws are superseded insofar as they 'relate to' and ERISA plan." *Moon v. BWX Techs. Inc.*, 498 F. App'x 268, 272 (4th Cir. 2012) (footnote and citation omitted). When presented with claims under state law that are said to implicate ERISA, a court must determine whether § 514 preempts the claims. *Darcangelo v. Verizon Commc'ns, Inc.*, 292 F.3d 181, 187 (4th Cir. 2002). To do so, a court must first determine whether an "employee welfare benefit plan" exists.[11] *Robinson*, 2009 WL 3233474, at *3. A court must next decide whether the state statutory or common law claim "relates to"[12] an employee benefit plan. *Griggs*, 237 F.3d at 377–78. If a welfare plan exists and state law relates to that plan, conflict "preemption under § 514 precludes prosecution of the preempted state-law claim" and the claim must be dismissed. *Marks*, 322 F.3d at 323.

---

[10] Section 1144(a) provides, in relevant part:

> [T]he provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under Section 1003(b) of this title.

28 U.S.C. § 1144(a).

[11] The Fourth Circuit defines an "employee welfare benefit plan" as: "(1) a plan, fund or program (2) established or maintained (3) by an employer . . . (4) for the purpose of providing medical, surgical, hospital care, [or] sickness . . . benefits (5) to participants or their beneficiaries." *Robinson v. AIG Life Ins. Co.*, No. 4:09cv105, 2009 WL 3233474, at *3 (E.D. Va. Oct. 7, 2009) (quoting *Madonia v. Blue Cross & Blue Shield of Va.*, 11 F.3d 444, 446 (4th Cir. 1993)) (internal quotations omitted) (alterations in original).

[12] A state law "'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983) (footnote omitted). The state law need not directly refer to such plans or be designed to affect the plans. *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 377–78 (4th Cir. 2001).

The Supreme Court has outlined three types of laws that ERISA preempts:  (1) "laws that mandate[] employee benefit structures or their administration;" (2) "laws that bind employers or plan administrators to particular choices or preclude uniform administrative practice;" or, (3) "laws providing alternate enforcement mechanisms for employees to obtain ERISA plan benefits."  *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1468–69 (4th Cir. 1996) (internal quotations and citations omitted) (alteration in original).  A state law claim of general applicability "which does not affect the relations among the principal ERISA entities (the employer, the plan fiduciaries, the plan, and the beneficiaries) as such, is not preempted by ERISA."  *Id*. at 1469 (citations omitted).

Relevant to the preemption issue here, ERISA has an "Evade or Avoid" provision at 29 U.S.C. § 1392(c) that provides "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction."  29 U.S.C. § 1392(c).  The Court must determine whether the Fund's VFTA claims constitute an alternate enforcement mechanism to this ERISA provision at § 1392(c) (which the Fund also relies on in Count V) to answer whether ERISA preempts Counts II and III.

> **2.    Because the Fund's VFTA Claims Constitute an Alternate Enforcement Mechanism Relating to Conduct Covered by ERISA's Evade or Avoid Cause of Action, ERISA Preempts the Fund's VFTA Claims in Counts II and III**

The Fund's VFTA claims[13] provide an alternate enforcement mechanism to the relief available under ERISA's "evade or avoid" cause of action found in 29 U.S.C. § 1392(c).[14]  Both

---

[13] The Fund brings an Evade or Avoid claim against each Defendants based on § 1392(c) in Count V.

[14]  The Virginia Fraudulent Transfers Act, Va. Code § 55.1-400, addresses fraudulent conveyance of property, and states in relevant part:

§ 1392(c) and the VFTA, when applied to an ERISA plan, forbid the fraudulent transfer of assets to avoid withdrawal liability. And both § 1392(c) and the VFTA state that the fraudulent transaction shall be void. Given that the two statutes forbid the same conduct relating to the recovery of ERISA benefits, ERISA preempts the Fund's VFTA claims. *Coyne*, 98 F.3d at 1469.

To determine whether ERISA preempts the VFTA, the Court must determine (1) whether an "employee welfare benefit plan" exists, *Robinson*, 2009 WL 3233474, at *3; and, (2) whether the VFTA relates to that employee benefit plan, *Griggs*, 237 F.3d at 377–78. Both factors are met here. First, the Fund is an employee benefit plan. The Fund describes itself as "an 'employee benefit plan' within the meaning of ERISA," (Compl. ¶ 3), and no Party contests that characterization.

Second, the VFTA, as the Fund seeks to apply that statute, "relates to" that employee benefit plan in that it seeks to recover plan benefits. *Griggs*, 237 F.3d at 377–78. The presupposition within the VFTA supports this conclusion. The VFTA does not provide creditors with substantive rights to property, but instead provides an alternate remedy for creditors to recover property to which they are already entitled. Va. Code. § 55.1-400 (every transfer "given with intent to delay, hinder or defraud creditors, purchasers or other persons of or *from what they are or may be lawfully entitled to* shall . . . be void" (emphasis added)). In this circumstance, the VFTA "relates to" an ERISA plan as it seeks to enforce a liability arising under that plan, thus forming "a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S.

---

Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, every suit commenced or decree, judgment or execution suffered or obtained and every bond or other writing given with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void . . . .

Va. Code. § 55.1-400.

85, 96–97 (1983).  Because an employee welfare benefit plan exists and the VFTA relates to that

plan, ERISA preempts the Fund's VFTA claims.

Furthermore, under the Fourth Circuit's guidance in *Coyne*, ERISA's Evade or Avoid

cause of action preempts the VFTA because it provides an "alternate enforcement mechanism[]"

for employees to obtain ERISA plan benefits."  *Coyne*, 98 F.3d at 1469; *see also Cromwell v.*

*Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1276 (6th Cir. 1991) ("It is not the label placed

on the state law claim that determines whether it is preempted, but whether in essence such a

claim is for the recovery of an ERISA plan benefit.").  Here, through its VFTA claims, the Fund

seeks recovery of an ERISA plan benefit through a Virginia cause of action.  ERISA provides a

remedy through § 1392(c), allowing for the same relief but involving different substantive

standards for assessing the fraudulent transfer. [15]

The VFTA, as the Fund seeks to employ it here, provides an "alternate enforcement

mechanism[]" for obtaining the same ERISA benefits available to the Fund under an ERISA

cause of action.  *Coyne*, 98 F.3d at 1468–69.  The VFTA would also provide different standards

under the "badges of fraud" test set forth in Virginia common law than the "principal purpose"

test set forth under ERISA.  *See Fox Rest Assocs. v. Little*, 717 S.E.2d 126, 131 (Va. 2011).

Because allowing the Fund to assert claims under the VFTA and § 1392(c) would subject plan

sponsors to "conflicting directives among states or between states," *Coyne*, 98 F.3d at 1470, the

VFTA claims must be preempted.  Accordingly, the Court will grant the Second Motion to

Dismiss the Fund's VFTA claims in Counts II and III.

---

[15] The Fund argues that ERISA does not preempt the VFTA because the "fraudulent transfer statute is a generally applicable statute that makes no reference to, and in fact, functions irrespective of, the existence of an ERISA plan." (Resp. Mot. Dismiss 17.)  But, as the Fourth Circuit has stated, the state law need not directly refer to an ERISA plan or be designed to affect an ERISA plan for preemption to occur.  *Griggs*, 237 F.3d at 377–78.  The state law need only provide an "alternate enforcement mechanism[]," as the VFTA does here.

### C.   Count V:   The Court Will Deny the Motion to Dismiss as to the Evade or Avoid Claim Brought Against Mason and Otey, but Will Grant the Motion to Dismiss as to EC Georgia and John Doe

The Fund states with particularity an Evade or Avoid Claim against Mason and Otey in Count V but fails to state such a claim against EC Georgia or John Doe.  Because the Fund does not allege that a principal purpose of the transactions between (1) EC Management and EC Georgia and (2) EC Management and John Doe were to avoid EC Management's withdrawal liability, the Fund cannot establish a plausible Evade or Avoid Claim against those defendants under the strictures of Rules 9(b) or 12(b)(6).

#### 1.   Legal Standard:  Evade or Avoid Claims Under 29 U.S.C § 1392(c)

Congress enacted the Multiemployer Pension Plan Amendments Act of 1980 "to protect the financial solvency of multiemployer pension plans . . . [by] requir[ing] most employers who withdraw from underfunded multiemployer pension plans to pay withdrawal liability."  *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp*., 522 U.S. 192, 196 (1997) (internal quotations and citations omitted).  Section 1392(c) of the MPPAA provides that "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction."  29 U.S.C. § 1392(c); *Teamsters Joint Council No. 83 of Virginia Pension Fund v. Empire Beef Co.*, No. 3:08cv340, 2011 WL 201492, at *3 (E.D. Va. Jan. 20, 2011).  "[T]he MPPAA makes it clear that an employer can have more than one principal purpose in conducting a transaction."  *Penske Logistics LLC v. Freight Drivers & Helpers Local Union No. 557 Pension Fund*, 721 F. App'x 240, 242 (4th Cir. 2018) (citations omitted).

Withdrawal liability does not attach, however, "unless evading withdrawal liability was 'one of the factors that weighed heavily in the [employer's] thinking.'"  *Empire Beef*, 2011 WL

201492, at *3 (quoting *Santa Fe Pac. Corp. v. Cent. States Se. & Sw. Areas Pension Fund*, 22 F.3d 725, 727 (7th Cir. 1994)); *see also SUPERVALU, Inc. v. Bd. of Trs. of the Sw. Pa. & W. Md. Area Teamsters & Emplrs. Pension Fund*, 500 F.3d 334, 341 (3d Cir. 2007) ("§ 4212(c) is violated when one of the main reasons for entering a transaction is to effectuate [the evasion of withdrawal liability]").  Mere awareness of withdrawal liability does not suffice to show evasive intent.  *Empire Beef*, 2011 WL 201492, at *5.  An employer should be "let off the hook even if one of his [or her] purposes was to beat withdrawal liability, provided however that it was a minor, subordinate purpose."  *Id.* at *3 (quoting *Santa Fe Pac. Corp.*, 22 F.3d at 727).

Because they sound in fraud, Evade or Avoid claims are subject to Rule 9(b)'s heightened pleading standards.  *See IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1058 (2d Cir. 1993).  When pursuing a fraud claim, a plaintiff "must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Generally, a plaintiff must articulate facts showing the "who, what, when, where, and how of the alleged fraud."  *United States ex rel. Wilson*, 525 F.3d at 379 (internal quotations and citation omitted).  As a general rule, courts "should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts."  *United States ex rel. Bunk v. Gov't Logistics N.V.*, 842 F.3d 261, 275 (4th Cir. 2016) (internal quotations and citations omitted).

### 2.      The Fund Alleges an Evade or Avoid Claim Against Mason and Otey

To state an Evade or Avoid Claim against Mason and Otey, the Fund must allege (1) a transaction allowing them to avoid withdrawal liability; and, (2) that a principal purpose of that

transaction was evading or avoiding liability to a pension plan. *See* 29 U.S.C. § 1392(c); *Empire Beef*, 2011 WL 201492, at *3. The Fund includes both elements against Mason and Otey with sufficient particularity to satisfy both Rule 9(b) and Rule 12(b)(6).

First, the Fund lists three transactions, initiated by Mason and Otey, transferring company assets into their personal use. (Compl. ¶¶ 29–31.) The Fund further states with particularity when these transactions occurred (after withdrawal liability had been assessed), to whom the transactions were made (Mason and Otey), and how (from personal to private use). (*Id.*) These transfers suffice as transactions under a plain reading of the statute.

The Named Defendants argue that Mason and Otey's retention of EC Management's company vehicles do not amount to a "transaction" as the term is used in § 1392(c). (Mem. Supp. Second Mot. Dismiss 20.) This line of argument fails to persuade. "Because ERISA and the MPPAA are remedial statutes, they should be liberally construed in favor of protecting the participants in employee benefit plans." *Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 98 (3d Cir. 2011) (internal quotations and citations omitted). Defined broadly, a transaction is "[s]omething performed or carried out; a business agreement or exchange." *Transaction*, Black's Law Dictionary (11th ed. 2019). Given this definition and considering the broad remedial purpose of ERISA and the MPPAA, the transfer of company vehicles from EC Management to Mason and Otey's personal use constitutes an act that is "performed or carried out" or an "exchange" sufficient to satisfy the requirements of § 1392(c). *Id*.

Second, the Fund has plausibly alleged at this stage of the litigation that "a principal purpose of" these transactions was to avoid withdrawal liability. 29 U.S.C. § 1392(c). Reading the Fund's Complaint favorably, the timing and nature of these transactions—after EC Management "experienced a permanent cessation of covered operations" and "withdrawal

liability had been assessed"—supports the clear inference that a principal purpose of these transactions was to shield these assets from the sizable withdrawal liability penalty.  (Compl. ¶¶ 18, 29–31.)

The Fund sets forth facts facially stating an Evade or Avoid Claim against Mason and Otey.  Furthermore, because Mason and Otey have "been made aware of the particular circumstances for which [they] will have to prepare a defense at trial" and the Fund "has substantial prediscovery evidence of those facts," the Fund's Evade or Avoid Claim satisfies the particularity requirement of Rule 9(b).  *United States ex rel. Bunk*, 842 F.3d at 275.  Because the Fund has stated an Evade or Avoid claims against Mason and Otey, the Court will deny the Second Motion to Dismiss as to the claims brought against them in Count V.

### 3.    The Fund Does Not Allege an Evade or Avoid Claim Against EC Georgia

In contrast, the Fund does not state an Evade or Avoid Claim against EC Georgia.  The Fund alleges that the $160,000 loan from EC Management to EC Georgia should "be disregarded and EC Georgia be held liable to the Fund for all amounts EC Management transferred to it." (Compl. ¶ 72.)  Because the Fund does not allege sufficiently particularized facts to state a plausible Evade or Avoid Claim against EC Georgia, the Court will dismiss this portion of Count V.

To reiterate, the Fund must allege (1) a transaction allowing EC Management to avoid withdrawal liability, and (2) that a principal purpose of that transaction was for EC Management to avoid withdraw liability.  29 U.S.C. § 1392(c).  The Fund does not meet its burden on either prong as to these Defendants.

First, although the Fund alleges that EC Management made a $160,000 loan to EC Georgia, it does not allege any facts about *when* that loan occurred.  (*See generally* Compl.)

Without any information or allegation about when EC Management made the loan to EC Georgia, the Court cannot infer that the transaction allowed EC Management to avoid withdrawal liability.  The loan could have been made years before withdrawal liability was assessed.  The Fund thus does not sufficiently state the "when" of the purported fraud and cannot make out the elements of a claim under Rule 9(b), *United States ex rel. Wilson*, 525 F.3d at 379 (internal quotations and citations omitted), or even under the lower standard in Rule 12(b)(6).

Second, the Fund fails to allege sufficient facts showing that "a principal purpose" of the transaction between EC Management and EC Georgia was to avoid withdrawal liability.  29 U.S.C. § 1392(c).  Unlike the transfer of company assets to personal use, a variety of legitimate business reasons could support one company offering a loan to another.  The Fund cannot identify a standard business transaction, and, without more, state that the transaction was taken to evade or avoid withdrawal liability.  *See Empire Beef*, 2011 WL 201492, at *4 (finding business canceling loan, even after withdrawal liability was assessed, did not support claim that transaction was taken with a principal purpose of avoiding withdrawal liability because the transaction was supported by adequate consideration).

Because the Fund pleads facts that are "merely consistent with" EC Georgia's liability, *Iqbal*, 556 U.S. at 678 (citations omitted), it does not satisfy the pleading requirements of Rule 9(b) or 12(b)(6).  Accordingly, the Court will dismiss Count V as to EC Georgia.

### 4.    The Fund Does Not Allege an Evade or Avoid Claim Against John Doe

The Fund also does not state an Evade or Avoid Claim against John Doe.  In the Complaint, the Fund alleges that "[u]pon information and belief, the principal purpose behind the joint venture payment of $1,522,227 to John Doe was to avoid or evade the payment of EC Management's withdrawal liability."  (Compl. ¶ 73.)  The Court will dismiss Count V against

26

John Doe for two reasons.  First, the Fund improperly names "John Doe" as a defendant in this action.  Second, the Fund does not state a cognizable Evade or Avoid Claim against John Doe under Rule 9(b) or Rule 12(b)(6).

> **a.** **The Court Will Dismiss Count V Against John Doe Because the Fund Improperly Names John Doe as a Defendant**

The Court will dismiss Count V against John Doe because the Fund improperly names John Doe as a defendant in this action.  In its February 28, 2020 Order, the Court ordered the Fund to show cause why "John Doe should not be dismissed from this action."  (Feb. 28, 2020 Order 1.)  In response, the Fund, providing substantially more facts than in their Complaint, say that it "discovered that, in 2013, while aware of its withdrawal liability obligations to the Fund, EC Management transferred $1,522,227 to an unknown joint venture, rather than pay the Fund." (Fund Resp. Show Cause Order 2, ECF No. 58.)  The Fund relates that "[t]he unknown joint venture is the John Doe named in this action."  (*Id.*)  In a deposition of George Otey, attached as an exhibit to the Fund's response, Otey identifies the joint venture as having been between EC Management and the Virginia Department for the Visually Impaired.  (*See* Fund Resp. Show Cause Order Ex. 2 "Deposition of George Otey" 7, ECF No. 58–2.)  The Named Defendants reply that the Fund "should name Virginia Department for the Visually Impaired as a Defendant . . . rather than proceed against an unidentified, John Doe."  (Named Defs.' Reply Show Cause 2, ECF No. 60.)

Because the Fund apparently discovered the identity of the alleged John Doe defendant prior to filing the Motion to Dismiss, the Court will dismiss John Doe as a defendant.  A "John Doe suit[] [is] permissible only against "real, but unidentified, defendants."  *Chidi Njoku v. Unknown Special Unit Staff*, No. 99-7644, 217 F.3d 840, at *1 (4th Cir. 2000) (citing *Schiff v. Kennedy*, 691 F.2d 196, 197 (4th Cir.1982)).  In particular, "[t]he designation of a John Doe

defendant is generally not favored in the federal courts; it is appropriate only when the identity of the alleged defendant is not known at the time the complaint is filed and the plaintiff is likely to be able to identify the defendant after further discovery." *Id.* (citation omitted).

As the Named Defendants note in response to the Court's Show Cause Order, the Fund became aware of "John Doe's" identity before the commencement of this action. (*See* Dep. George Otey 7.) The Court should "not permit the use of a 'John Doe' designation for a defendant if the plaintiff's ignorance of the defendant's true identity is the result of willful neglect or lack of reasonable inquiry." *Saunders v. Boddie-Noell Enters., Inc.*, No. 7:08cv110, 2008 WL 2553047, at *2 (W.D. Va. June 25, 2008) (quoting 2 J. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 10.02(2)(d)(I), p. 10–16 (3d ed. 2005)). Accordingly, the Court will dismiss John Doe without prejudice from Count V.

### b. The Fund Does Not Show That the Joint Venture Payment Was Made to John Doe with a Principal Purpose of Avoiding Withdrawal Liability

Second, even if John Doe were properly named in this action, the Fund does not state with particularity a plausible evade or avoid claim against him. Again, the Fund must allege (1) a transaction allowing them to avoid withdrawal liability; and, (2) that a principal purpose of that transaction was for them to avoid withdraw liability. 29 U.S.C. § 1392(c). The Court reads their claims most favorably.

In support, the Fund identifies the joint venture payment of $1,522,227 to John Doe and states, "upon information and belief," that "the principal purpose" of that payment "was to avoid or evade the payment of EC Management's withdrawal liability." (Compl. ¶ 73.) Beyond this legal conclusion, however, the Fund pleads no facts showing that a "principal purpose" of this payment was to avoid withdrawal liability. 29 U.S.C. § 1392(c). While the payment occurred in

2014—and therefore, unlike the loan to EC Georgia, plainly after withdrawal liability was assessed—that fact is merely consistent with liability.  But a number of reasons exist for why a company such as EC Management might make a joint venture payment to another business before it dissolved in 2016.  (Compl. ¶ 26.)  For the Fund's Evade or Avoid Claim to "cross the line between possibility and plausibility of entitlement to relief," *Francis,* 588 F.3d at 193 (internal quotations omitted), it must allege some further facts concerning the nature of the payment or the identity of the recipient.  Without more factual basis as to the nature and purpose of this joint venture payment, the Fund does not state particularized allegations rendering it plausible that a principle purpose of the transaction was to avoid withdrawal liability.

Because the Fund improperly names John Doe as a defendant in this action, and because it fails to state an Evade or Avoid Claim against John Doe, the Court will dismiss without prejudice the Fund's Evade or Avoid Claim against John Doe in Count V.

### D.   Count IV:  The Court Will Grant the Second Motion to Dismiss as to Withdrawal Liability Against EC Georgia and John Doe

The Fund alleges that both EC Georgia and John Doe constitute "single employer[s] and/or alter ego[s] with EC Management" and as such should be held liable for EC Management's withdrawal liability.[16]  (Compl. ¶¶ 63, 65.)  Because the Fund does not plead sufficient facts to show that either EC Georgia or John Doe constituted single employers with or alter egos of EC Management, the Court will dismiss Count IV.[17]

---

[16] Because the Court finds that the Fund improperly names John Doe as a defendant in this action, the Court dismisses Count IV against John Doe without prejudice.  As with the Fund's claim in Count V, the Court independently finds that the Fund does not allege facts sufficient to state a claim for withdrawal liability against John Doe under either a single employer or an alter ego theory.

[17] The Court notes that Count IV raises two theories of liability—a single employer theory and alter ego theory—that are not properly plead because they rest in the same count.  *See Bd. of Trs. of the Trucking Emps. of N.J. Welfare Fund, Inc. v. 160 E. 22nd St. Realty, LLC*, No.

For reasons articulated below, the Court concludes that the Fund does not state a claim under either a single employer theory of liability or an alter ego theory of liability and will dismiss those claims without prejudice.  Should the Fund seek to replead Count IV, it must assert any claims arising under an alter ego theory and a single employer theory of liability in separate counts.

### 1.    The Fund Does Not State a Claim Against EC Georgia for Withdrawal Liability Under a Single Employer Theory

The Fund does not state a claim against EC Georgia under a single employer theory of liability.  In the Fourth Circuit, "[t]he law is well settled that the controlling criteria in determining whether two or more employing entities constitute a single employer are (1) common ownership, (2) interrelation of operations, (3) common management, and (4) centralized control of labor relations."  *Vance v. NLRB*, 71 F.3d 486, 490 (4th Cir. 1995) (per curiam) (citations omitted).  Courts have cautioned that "[n]o one factor is determinative" and there need not be extensive evidence of all four factors "to find single employer status."  *Id*.  The Fourth Circuit has however stated that "control of labor operations is the most critical factor." *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 442 (4th Cir. 1999) *abrogated on other grounds by Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006).

Here, the Fund does not state a claim under a single employer theory of liability because it plausibly pleads only one of the four *Vance* factors:  that an "interrelation of operations" existed between EC Management and EC Georgia.  *Vance*, 71 F.3d at 490.  In its Complaint, the Fund states that Mason Otey's brother "Antonio Otey worked for EC Management from 1986 to 2000 and at various intermittent times thereafter" and that "EC Management's website . . . still

---

15cv889, 2016 WL 4582046, at *7 (D.N.J. Sept. 2, 2016) (finding that a single employer theory of liability and alter ego theory raised differing questions of law not properly presented in the same claim).  For this reason, the Court will analyze the two theories under separate heading.

cites Antonio Otey as EC Management's Chief Financial Officer."  (Compl. ¶ 34.)  As to

interrelation of operations, the Fund alleges that:

> (1) "EC Management and EC Georgia both provided janitorial services and served
> the same customers;" (2) "EC Georgia performed a number of services for EC
> Management, including accounting services;" (3) "EC Management and EC
> Georgia operated out of the same office building;" (4) "EC Georgia assumed EC
> Management's lease after EC Management dissolved;" (5) and, "EC Management
> and EC Georgia shared the same telephone number from at least 2009."

(*Id*. ¶¶ 35–37.)  The Fund further avers that "EC Management transferred at least $160,000 to EC

Georgia purportedly as a 'loan,' without documenting the loan or seeking re-payment of the

loan."  (*Id*. ¶ 38.)

Although the Complaint clearly alleges that the two companies shared common

management and interrelation of operations, the Court finds that the Complaint does not allege at

all that EC Management or EC Georgia shared "common ownership" or exercised "centralized

control of labor relations" at any time.  *Vance*, 71 F.3d at 490.  While averring that Antonio Otey

previously worked for EC Management, the Fund does not state that he continued to work for

EC Management while he owned EC Georgia.  Instead, the Fund only vaguely asserts that

Antonio worked for EC Management "at various intermittent times thereafter."  (*Id*. ¶ 34.)  An

allegation that Antonio worked for EC Management fourteen years before the Fund assessed

withdrawal liability, and a vague assertion that relationship may have continued at some point

thereafter, does not plausibly show significant "common management" of EC Management and

EC Georgia.  *Vance*, 71 F.3d at 490; *see also Hukill*, 192 F.3d at 443 (citing cases where

"common management found where the same individual was president of both corporations").

And while some interrelation of operation between the companies existed, the Fund does

not state facts, taken as true, that would plausibly show that the two entities were interrelated to

the point where they constituted a single employer.  As the Fourth Circuit has stated, the

provision of services between companies "is not unusual in today's business climate." *Hukill*, 192 F.3d at 443. The *Hukill* Court found that several companies did not become one employer by merely providing each other with various financial services, using the same letterhead, and running advertisements implying their affiliation. *Id*. Here too, although EC Georgia performed services for EC Management, assumed EC Management's lease, and shared the same telephone number, (Compl. ¶¶ 35–37), these facts alone do not state facts sufficient to overcome the other three *Vance* factors, particularly where the Fund makes no allegations concerning the centralized control of labor relations, which the Fourth Circuit has identified as the most critical factor. *Hukill,* 192 F.3d at 443.

The Court finds that these allegations, even favorably read, do not state a claim that EC Management and EC Georgia constituted a single employer. Considering the totality of the *Vance* factors, the Court determines that the Fund does not state a claim for single employer withdrawal liability against EC Georgia. The Court will dismiss the Fund's single employer claim in Count IV against EC Georgia and John Doe without prejudice.[18]

> ### 2. The Fund Does Not State a Claim Against EC Georgia for Withdrawal Liability Under an Alter Ego or Piercing the Corporate Veil Theory

For many of the same reasons, the Fund cannot prevail on an alter ego theory of liability against EC Georgia. To prevail on an alter ego theory of liability, the Fund must state facts sufficient to pierce the corporate veil.[19]

---

[18] The Fund also does not state a claim against John Doe in Count IV for withdrawal liability. Notably, the Fund does not meet even one of the *Vance* factors as to John Doe: it does not allege facts showing "(1) common ownership (2) interrelation of operations, (3) common management, [or] (4) centralized control of labor relations." 71 F.3d at 490.

[19] The Court finds that the Fund does not plausibly allege sufficient facts to state a claim under an alter ego theory of liability as to all claims under the less rigorous federal standard. Because, as previously discussed, the Virginia veil-piercing standard is more rigorous, the Court

The same result holds under the federal common law of alter ego liability.  In determining whether to pierce the corporate veil and apply alter ego liability under federal law, the Fourth Circuit in *Thomas v. Peacock* adopted the First Circuit's "liberal veil piercing standard."  39 F.3d 493, 504 (4th Cir. 1994).  Under that federal common law standard, courts should look to:  (1) the "respect paid by the shareholders" to the "separate corporate identity;" (2) "the fraudulent intent of the incorporators;" and, (3) "the degree of injustice that would be visited on the litigants by recognizing the corporate identity."  *Alman v. Danin*, 801 F.2d 1, 4 (1st Cir. 1986).  The Fourth Circuit has identified a number of factors to consider in determining whether to pierce the corporate veil, including:

> gross undercapitalization of the subservient corporation; failure to observe corporate formalities; nonpayment of dividends; siphoning of the corporation's funds by the dominant corporation; non-functioning of officers and directors; absence of corporate records; and the fact that the corporation is merely a facade for the operation of the dominant stockholder or stockholders.

*Keffer v. H.K. Porter Co.*, 872 F.2d 60, 65 (4th Cir. 1989) (citation omitted).

The record here is bereft of any allegation of even one of the factors above.  Here, no indication exists that the shareholders or owners EC Management and EC Georgia failed to pay respect to the separate corporate identity of the two companies, or that the incorporators had fraudulent intent.  *Id.*  The Fund does not allege any facts concerning "gross undercapitalization" of either corporation, a "failure to observe corporate formalities," the "non-functioning of officers and directors" or the "absence of corporate records."  *Id.*  While the loan from EC Management to EC Georgia could plausibly show "siphoning of the corporation's funds by the dominant corporation," that sole allegation does not show that one company "is merely a facade

---

also finds that the Fund does not plausibly state facts to pierce the corporate veil under the Virginia two-part test.  *O'Hazza*, 431 S.E.2d at 320–21.

for the operation of the dominant stockholder or stockholders." *Id*. Indeed, the Fund never alleges that EC Georgia was the "dominant corporation" in the relationship. *Id*.

The Court concludes that the Fund does not state facts supporting a claim for alter ego withdrawal liability against EC Georgia or John Doe.[20] The Court therefore dismisses the Fund's alter ego claim against EC Georgia and John Doe in Count IV without prejudice.

## IV. Conclusion

For the foregoing reasons, the Court will grant in part and deny in part the Named Defendants' Second Motion to Dismiss. An appropriate Order shall issue.

_____

/s/

M. Hannah Lauck
United States District Judge

Date: 3|31|2021
Richmond, Virginia

---

[20] Similarly, the Fund makes no substantial allegations that John Doe acted as the alter ego of EC Management. Indeed, apart from the one alleged transfer from EC Management to John Doe, the Fund asserts no facts showing a lack of "separate corporate identity" between the two companies. *Alman*, 801 F.2d at 4.